IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICK G. STALLINGS,

        Petitioner,

v.                                   CIV 20-0014 JB/KBM

DWAYNE SANTISTEVAN, et al.,

        Respondents.

## **PROPOSED FINDINGS OF FACT AND RECOMMENDED DISPOSITION**

THIS MATTER comes before the Court on the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (*Doc. 1*), filed by Rick G. Stallings ("Petitioner") on January 6, 2020. Respondents filed their Answer to this Petition on October 27, 2020. *Doc. 10*. The Honorable James O. Browning referred this case to me to conduct hearings, if warranted, including evidentiary hearings, and to perform any legal analysis required to recommend to the Court an ultimate disposition of the case. *Doc. 3*. Having reviewed the submissions of the parties and the relevant law, the Court recommends that the Petition be denied on its current record.[1]

---

[1] The Court need not hold an evidentiary hearing, as Petitioner has not made any showing that his claims rely on "a new rule of constitutional law, made retroactive . . . by the Supreme Court[,]" "a factual predicate that could not have been previously discovered through the exercise of due diligence[,]" or that "the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty[,]" as required by 28 U.S.C. § 2254(e)(2).

## I.  Background Facts and Procedural Posture

In late 2015, Petitioner was being held as a pretrial detainee at San Juan County Adult Detention Center on charges of capital murder, aggravated burglary, larceny in an amount over $20,000, larceny with a firearm, unlawful taking of a motor vehicle, possession of a firearm by a felon, and credit card theft, *see New Mexico v. Stallings*, D-1116-CR-2015-00901 (11th Jud. Dist. N.M.),[2] as well as unlawful taking of a motor vehicle and conspiracy to commit an unlawful taking of a motor vehicle, *see New Mexico v. Stallings*, D-1116-CR-2015-00893 (11th Jud. Dist. N.M.). At that time, Petitioner was being held in solitary confinement due to his pending homicide charge. *Doc. 10-1*, Ex. Z, at 171; *Doc. 10-1*, Ex. J(1), at 43. During a search of Petitioner's cell, jail officials found Petitioner to be in possession of the detached temple piece from a pair of eyeglasses, which had been sharpened to a point (hereinafter "eyeglass piece"). *Doc. 10-1*, Ex. Z, at 171. San Juan County Adult Detention Center initiated disciplinary proceedings against Petitioner based upon the discovery of this eyeglass piece, following which Petitioner lost privileges and was given "lockdown time." *Doc. 10-1*, Ex. EE, at 272.

In addition, Petitioner was charged in state district court with possession of a deadly weapon by a prisoner, a second-degree felony, in violation of N.M. Stat. Ann. § 30-22-16 (1978). *Doc. 10-1*, Ex. A, at 1. It is Petitioner's conviction on this charge from which he now seeks relief. *See Doc. 1*.

---

[2] The Court may take judicial notice of relevant records from state district court. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979).

Petitioner was ultimately found guilty of possession of a deadly weapon and sentenced to nine years of imprisonment plus a four-year habitual offender enhancement, for a total of thirteen years. *Doc. 10-1*, Ex. V, at 142-45. Previously, in his homicide case, D-1116-CR-2015-00901, Petitioner was found guilty of all but one charge and was sentenced to life imprisonment plus sixteen and a half years. *See Doc. 10-1*, Ex. OO, at 377-78; Ex. QQ, at 382-89. The court determined that Petitioner's sentence for possession of a deadly weapon would run consecutively to the sentence imposed in his homicide case. *See Doc. 10-1*, Ex. V, at 144.

Petitioner appealed his deadly-weapon conviction. *See Doc. 10-1*, Ex. W, at 146. The New Mexico Court of Appeals assigned the matter to its summary calendar, proposing summary affirmance. *Doc. 10-1*, Ex. Y, at 162-65. Attorney Will O'Connell of the Public Defender Department filed a Memorandum in Opposition to Proposed Summary Affirmance and Motion to Amend Docketing Statement ("Memorandum in Opposition") on Petitioner's behalf. *Doc. 10-1*, Ex. Z, at 167-92. Mr. O'Connell maintained that (1) Petitioner was subject to double jeopardy; (2) his trial counsel, Liane E. Kerr, was ineffective; (3) he was denied his constitutional right to represent himself; and (4) he was unconstitutionally ejected from trial. *Id.* at 167. The Court of Appeals affirmed the trial court in an August 2018 Memorandum Opinion. *Doc 10-1*, Ex. AA, at 193-99.

First, the appellate court rejected Petitioner's double jeopardy claim, concluding that the remedial sanctions by prison management and the subsequent and independent criminal proceedings for violation of N.M. Stat. Ann. § 30-22-16 did not implicate double jeopardy. *Id.* at 195. It further reasoned that Petitioner had not shown

3

ineffective assistance of counsel, because the defense that he suggested counsel should have asserted (i.e. that the shank was not a weapon but a "tool for opening handcuffs and restraints") was unlikely to succeed. *Id.* at 196-97. Finally, the court concluded that Petitioner had been afforded adequate protections by the trial judge such that he was not denied his right to self-representation or his right to be present at trial. *Id.* at 197-98.

Next, Petitioner filed a Petition for Writ of Certiorari, which the New Mexico Supreme Court denied on September 5, 2018. *Doc. 10-1,* Ex. BB, at 200-17; Ex. CC, at 218-19.

On May 1, 2019, Petitioner filed a *pro se* Petition for a Writ of Habeas Corpus in state district court, reasserting his claims of ineffective assistance, insufficient evidence, and double jeopardy. *Doc. 10-1,* Ex. EE, at 221-27. In addition, Petitioner maintained that he was prevented from taking the stand in his own defense or calling witnesses, denied the opportunity to present exculpatory evidence, deprived of a venue change, and failed to receive a speedy trial. *Id.* at 222-24. The Law Offices of the Public Defender provided a Notice of 5-802(H)(1) Pre-Appointment Review of Petitioner's Writ of Habeas Corpus, determining that it was "not a proceeding that a reasonable person with adequate means would be willing to bring at a person's own expense." *Doc. 10-1*, Ex. FF, at 280-84. The state district court determined that Petitioner was not entitled to relief as a matter of law and dismissed the petition. *Doc. 10-1*, Ex. GG, at 285-86.  The New Mexico Supreme Court denied review of the petition without discussion. *Doc. 10-1*, Ex. KK, at 364.

On January 6, 2020, Petitioner filed the instant federal habeas petition. *Doc. 1*. Parroting many of the factual and legal assertions articulated on direct appeal and in his state habeas petition, Petitioner asserts violations of his constitutional rights to: (a) freedom from double jeopardy (Ground One); (b) the effective assistance of counsel (Grounds Two and Six[3]); (c) self-representation and courtroom presence (Grounds Three and Four); (d) due process and the right to the preservation of evidence (Ground Five); and (e) a speedy trial (Ground Eight). *Doc. 1* at 5-10, 16-20. Additionally, Petitioner maintains that the trial court neglected to decide two *pro se* motions for change of venue (Ground Seven). *Id.* at 18-19.

Petitioner filed his federal habeas petition after April 24, 1996; thus, it is subject to the terms of the Antiterrorism and Effective Death Penalty Act (AEDPA). For purposes of the "in custody" requirement of 28 U.S.C § 2254, Respondents concede that Petitioner was in custody at the filing of the Petition and the Answer. *Doc. 10* at 4. Petitioner is in state custody pursuant to the Judgment and Sentence filed on January 5, 2018, in the District Court of San Juan County, New Mexico. *See Doc. 10-1*, Ex. V, at 142-45.

## II.    Legal Standard

Federal courts have statutory authority under 28 U.S.C. § 2254, as amended by AEDPA, to issue habeas corpus relief for persons in state custody. *See Harrington v. Richter*, 562 U.S. 86, 97-98 (2011). AEDPA "circumscribes our review of federal habeas claims that were adjudicated on the merits in state-court proceedings[,]" subject to only two exceptions. *Hooks v. Workman*, 689 F.3d 1148, 1163 (10th Cir. 2012) (citation

---

[3] The Court agrees with Respondents that Petitioner's Ground Six is best treated as one subsumed within Ground Two. *See Doc. 1* at 7, 17; *see also Doc. 10* at 3 n.4.

omitted).

A federal court may grant relief from a state court decision only where a petitioner demonstrates that the trial court's resolution of his claims was "'contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States' or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Id.* (quoting 28 U.S.C. § 2254(d)(1), (2)) (subsequent citation omitted). In analyzing the state court's decision, the Court may only review the record that was before the state court and all factual findings are presumed correct unless rebutted by "clear and convincing evidence." *Id.* (quoting 28 U.S.C. § 2254(e)) (subsequent citation omitted).

Under § 2254(d)(1), the threshold question asks whether the applicant is seeking to invoke a rule of law that was clearly established by the Supreme Court at the time the conviction became final. *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011) (citation omitted); *see also Williams v. Taylor*, 529 U.S. 362, 390 (2000). If the law was clearly established, then the court determines whether the state court decision was "contrary to or involved an unreasonable application of that clearly established law." *Byrd*, 645 F.3d at 1165 (quoting *Turrentine v. Mullin*, 390 F.3d 1181, 1189 (10th Cir. 2004)).

First, a state-court decision is "contrary to" clearly established law "if the state court applies a rule different from the governing law set forth" by the Supreme Court or "if it decides a case differently than [the Supreme Court has] done on a set of materially indistinguishable facts." *Hooks*, 689 F.3d at 1163 (quoting *Bell v. Cone*, 535 U.S. 685,

694 (2002)). The state court is not required to cite to, or even be aware of, Supreme

Court decisions, "so long as neither the reasoning nor the result of the state-court

decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Second, "[a] state-court decision is an 'unreasonable application' of clearly

established federal law when the state court 'identifies the correct governing legal

principle from th[e Supreme] Court's decisions but unreasonably applies that principle to

the facts of petitioner's case.'" *Hooks*, 689 F.3d at 1163 (quoting *Wiggins v. Smith*, 539

U.S. 510, 520 (2003)). AEDPA precludes issuance of a writ simply because the federal

court concludes in its independent judgment that the state court applied the federal law

erroneously or incorrectly. *Byrd*, 645 F.3d at 1166. Instead, the application must also be

"objectively unreasonable." *Id.* (quotation omitted). As long as "fairminded jurists could

disagree" as to the correctness of the state court's decision, *Yarborough v. Alvarado*,

541 U.S. 652, 664 (2004), this "'highly deferential standard for evaluating state-court

rulings[ ]' . . . demands that state-court decisions be given the benefit of the doubt."

*Hooks*, 689 F.3d at 1163 (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)).

Even if a federal habeas court finds that the state court decision was contrary to

or an unreasonable application of clearly established federal law, habeas relief may not

issue unless the violation is of a sort that warrants such relief. *See e.g., Williams*, 529

U.S. at 375 ("It is, of course, well settled that the fact that constitutional error occurred in

the proceedings that led to a state-court conviction may not alone be sufficient reason

for concluding that a prisoner is entitled to the remedy of habeas.") (citations omitted);

*Wilson v. Sirmons,* 536 F.3d 1064, 1073 (10th Cir. 2008) ("If we find that the state court

erred, we still must determine whether the error is a structural defect 'in the constitution

of the trial mechanism, which def[ies] analysis by "harmless-error" standards.'") (quoting *Arizona v. Fulminante,* 499 U.S. 279, 309 (1991)), *rehearing en banc granted on separate issue,* 549 F.3d 1267 (10th Cir. 2008).

Factual determinations qualify as unreasonable "if all '[r]easonable minds reviewing the record' would agree" that they were incorrect. *Smith v. Aldridge*, 904 F.3d 874, 880 (10th Cir. 2018) (quoting *Brumfield v. Cain*, 576 U.S. 305, 314 (2015)). "[W]here the state courts plainly misapprehend or misstate the record in making their findings, and the misapprehension goes to the material fact that is central to petitioner's claim, that misapprehension can fatally undermine the fact-finding process, rendering the resulting factual finding unreasonable." *Byrd*, 645 F.3d 1171-72 (10th Cir. 2011) (quotation omitted).

Because Petitioner is proceeding *pro se*, the Court construes his pleadings liberally. *See Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). The Court will not, however, "take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record." *Id.* (citation omitted).

## III.  Discussion

Petitioner asserts violations of his constitutional rights in seven of his eight grounds for relief, some exhausted and others unexhausted. Rather than addressing Petitioner's grounds in numerical order, the Court will address them in the order most analytically appropriate, beginning with Ground Seven.

### A.  Exhaustion and Procedural Default

As an initial matter, a petitioner in a habeas action brought pursuant to 28 U.S.C. § 2254 must establish that he has properly exhausted available state-court remedies by

raising his federal claims in the state's highest court, either by direct review or in post-conviction proceedings. *Dever v. Kan. State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994). Here Respondents concede that, with the exception of his preservation of evidence claim and "three ineffective-assistance sub-claims,"[4] Petitioner properly exhausted his claims in the state courts, rendering them ripe for review. *See Doc. 10* at 4. As to the identified unexhausted claims, Respondents explain that they nevertheless waive the exhaustion requirement, preferring consideration on the merits. *Id.* at 1. As such, Respondents address each of Petitioner's claims in their Response. *See id.* Because Petitioner's unexhausted arguments are easily resolved on the merits, the Court recommends consideration of the entirety of the Petition. *See* 28 U.S.C. § 2254(b)(2) (providing that a petition for writ of habeas corpus may be denied on the merits, even when the petitioner fails to properly exhaust remedies in state court).

### B. Change of Venue Claim (Ground Seven)

In Ground Seven, Petitioner maintains that the state trial court neglected to decide "two *pro se* motions for a change of venue[,]" which he filed in his deadly-weapon case on July 4, 2016, and August 1, 2017. *See Doc. 1* at 18. In support of this claim, he submits that he "made [his] reasons for a change of venue very clear on why [he] could not get a fair trial on this case." *Id.* According to Petitioner, "there were 14 articles published online concerning [him] in reference to murder case and present case in Aztec, Farmington and Durango, Colorado area." *Id.* Additionally, Petitioner alleges that a change of venue was necessary because the trial judge had "personal knowledge

---

[4] Specifically, Respondents maintain that Petitioner has not met the exhaustion requirement as to assertions that his trial attorney was ineffective when she (1) failed to present two witnesses he identified; (2) withdrew Petitioner's *pro se* motion for change of venue; and (3) refused to recuse herself or to resolve a conflict of interest. *See Doc. 10* at 4 n.5 (citing *Doc. 1* at 7).

of Buck Harris, who was a close associate to a witness against [him] in murder case." *Id.* As best the Court can surmise, Petitioner's position is that he was entitled to a change of venue because of pretrial publicity as well as a conflict of interest by the presiding trial judge.

The state court docket reveals that Petitioner filed a *pro se* motion for a change of venue in the underlying state criminal case on August 1, 2017. *See Stallings*, D-1116-CR-2016-0054 (11th Jud. Dist. N.M. Aug. 1, 2017); *see also Doc. 10-1*, Ex. L, at 51. In his August 1, 2017 motion, Petitioner argued that his trial should be moved because there had been substantial publicity in his case, the trial judge had various conflicts of interest,[5] he had previously terminated an attorney-client relationship with the head of the District Attorney's office, and he did "not feel any judge within San Juan County would give [him] a fair jury trial." *Id.*

A separate motion for change of venue was filed in 2015 by Petitioner's defense counsel, Thomas M. Clark, in Petitioner's homicide case.[6] *See Stallings*, D-1116-CR-2015-00901 (11th Jud. Dist. N.M. Dec. 9, 2015). At a November 2016 hearing, Mr. Clark advised the trial court that his change of venue motion was not yet ripe for ruling. *Doc. 10-1*, Ex. E, at 22. At the same hearing, Petitioner personally accused the trial

---

[5] Petitioner alleged that the trial judge "dislike[d]" him, that she had a "personal relationship" with an attorney who represented witnesses in his murder case, and that she had "some type of friendship" with the husband of "Julie Harris," who purportedly contacted her requesting placement in a treatment program in lieu of prison for a witness against Petitioner. *Doc. 10-1*, Ex. L, at 51.

[6] In the December 2015 Motion filed by Mr. Clark on Petitioner's behalf, Mr. Clark argued that "press coverage was extensive and negative toward [Petitioner]" such that Petitioner would "not receive a fair trial if the trial [was] held in San Juan County." *See State v. Stallings*, D-1116-CR-2015-00901 (Dec. 9, 2015) (Motion to Transfer Venue). Counsel did not make any assertions concerning a conflict of interest by the trial judge. *See id.*

judge of having conflicts of interest requiring her recusal and expressed frustration that

Mr. Clark had not moved for her recusal. *Id.* at 20. The trial judge responded, explaining

that Petitioner did not have a right to recuse her because he had already recused the

first judge assigned to his case. *Id.* She also advised that she was not aware of any

conflict of interest on her part that required recusal. *Id.* Mr. Clark likewise indicated that

he was not aware of any conflict requiring recusal of the trial judge, and he agreed

Petitioner did not have a right to the preemptory recusal of a second judge. *Id.* at 24. Mr.

Clark assured the trial judge that he would bring to her attention any potential conflict

that he uncovered in his representation of Petitioner. *Id.* Mr. Clark's change of venue

motion was ultimately withdrawn by subsequent counsel on November 2, 2017. *See*

*Stallings*, D-1116-CR-2015-00901 (11th Jud. Dist. N.M. Nov. 2, 2017).

    At a pretrial hearing in September 2017, the trial court acknowledged that

Petitioner's August 1, 2017 *pro se* motion for change of venue remained outstanding.

*Doc. 10-1*, Ex. S, at 76. The court explained that it had previously denied a motion for

change of venue of Petitioner's case. *Id.* Petitioner's counsel at that time, Ms. Kerr,

indicated that she and Petitioner were withdrawing the motion. *Id.* ("We with draw [sic]

that mtn.") The Court cannot say that it was unreasonable for Ms. Kerr to withdraw

Petitioner's motion for change of venue under the circumstances.[7] But, more

---

[7] In Ground Two of his Petition, Petitioner asserts that Ms. Kerr was ineffective when she "asked that change of venue motion be withdrawn without [Petitioner's] permission." *Doc. 1* at 7. To the extent Petitioner couches his change of venue claim as one for ineffective assistance of counsel, his claim also fails. Motions practice, like other decisions concerning the trial of a case, is a tactical matter for counsel's consideration. *See United States v. Tucker*, No. 14-CR-004020CMA, 2017 WL 6034368, at *2 D. Colo. Oct. 6, 2017). Here, Petitioner's *pro se* motion for change of venue was deficient for the reasons outlined above, and Ms. Kerr made a sound strategic decision not to continue to pursue the motion. Moreover, Petitioner fails to demonstrate prejudice, as he fails to establish that his change of venue motion was likely to succeed.

importantly, Petitioner's present claim – that the state court failed to rule upon his *pro se* change of venue motion – fails for the reasons that follow.

Most obviously, Petitioner's claim is simply not supported by the record, which shows that his *pro se* motion was *withdrawn* rather than overlooked by the trial court. Even if the motion had not been withdrawn, however, the record suggests that it was implicitly denied. The trial judge specifically denied any conflict of interest requiring her recusal when Petitioner broached the issue at a November 2016 hearing. See *Doc. 10-1*, Ex. E, at 22. She also indicated that she had already denied one request for a venue change in Petitioner's case, meaning that she was not persuaded that he had demonstrated that a fair trial could not be held in San Juan County. *See Doc. 10-1*, Ex. S, at 76. Finally, the trial judge proceeded to trial without changing the venue, suggesting that she implicitly concluded that no actual prejudice existed. *See New Mexico v. Gutierrez*, 258 P.3d 1024, 1041  (N.M. 2011) (reasoning that "when the record reflects that the district court decided to impanel a jury from the available jurors after voir dire, we will conclude that the district court implicitly determined that actual prejudice did not exist, even though no written order has been entered to that effect") (citation omitted).

Although Petitioner maintains that there was pretrial publicity concerning his case, including 14 articles, such publicity alone does not demonstrate entitlement to a change of venue. *See Goss v. Nelson*, 439 F.3d 621, 628-29 (10th Cir. 2006) (reasoning that demonstrating "extensive pretrial publicity will not suffice to demonstrate" that the community was pervaded by an "irrepressibly hostile attitude," which is required to establish presumed prejudice) (quotation omitted). Further, a state

court's factual findings, including those concerning the impact of pretrial publicity on a defendant's ability to obtain a fair trial, are presumed correct unless rebutted by clear and convincing evidence. *See House v. Hatch*, 527 F.3d 1010, 1025 (10th Cir. 2008). Petitioner has not presented clear and convincing evidence showing widespread, inflammatory publicity that necessitated a change of venue in this case. The state trial court, having already passed on this issue, determined that "no facts support[ed] Petitioner's] request[]" for a venue change. *See Doc. 10-1*, Ex. GG, at 286. As such, Petitioner fails to demonstrate an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *See* 28 U.S.C. § 2254(d)(2).

Petitioner also fails to demonstrate that the state court's resolution (or lack of resolution) of his motion for change of venue was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." *See* 28 U.S.C. § 2254(d)(1). In fact, Petitioner does not even identify a federal law that the state trial court purportedly violated when it failed to grant his motion for change of venue. The statute governing venue changes in state prosecutions, § 38-3-3, is a *state* statue permitting a trial to be held in another county if the defendant is unable to obtain a fair trial in the county where the matter is pending. N.M. Stat. Ann. § 38-3-3 (2003). Thus, even if Petitioner could demonstrate that the state trial court violated the state venue change statute, which he cannot, he would not be entitled to federal habeas relief.

Moreover, Tenth Circuit law suggests that establishing the right to federal habeas relief premised upon a state court's resolution of a motion for change of venue is no easy feat. In *House*, the petitioner sought such relief on the ground that the state trial

court transferred the venue of his case to a different county in violation of his constitutional rights. 527 F.3d at 1020-21. The petitioner there maintained that the state trial court violated his Sixth and Fourteenth Amendment rights by transferring his case without assuring that he was afforded equal protection of the law, by failing to conduct *voir dire* prior to transfer, and by transferring for a discriminatory purpose. *Id.* However, the Tenth Circuit affirmed the federal district court's denial of the federal habeas petition, reasoning that there were no Supreme Court cases holding that a state court's resolution of a request for transfer of venue violated the constitution in ways the petitioner alleged. *Id.* at 1021-27. Here, Petitioner does not contend that the state court's resolution of his change of venue motion was contrary to a federal law, nor does he reference a Supreme Court case that might support his claim. Petitioner's claim fails for this reason as well.  The Court, thus, recommends denial of the Petition as to Ground Seven.

### C.  Double Jeopardy Claim (Ground One)

Petitioner contends that his double jeopardy rights were violated when he was punished twice for the single act of possessing a sharpened eyeglass piece while incarcerated in the San Juan County Adult Detention Center. *Doc. 1* at 5. He insists that he was first subject to restrictions of privileges and disciplinary segregation by jail authorities and thereafter to criminal penalties following his prosecution by the State. *Id.*

The Fifth Amendment's double jeopardy clause provides that no "person [shall] be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend V. The clause provides protection beyond a person's literal "life or limb[,]" and "jeopardy describes the risk that is traditionally associated with a criminal prosecution."

14

*Breed v. Jones*, 421 U.S. 519, 528 (1975) (citations omitted). The United States Supreme Court has clarified that the clause "does not prohibit the imposition of all additional sanctions that could, 'in common parlance,' be described as punishment." *Hudson v. United States*, 522 U.S. 93, 98-99 (1997) (quotation omitted). Rather, it protects against multiple *criminal* punishments, but not generally against independent administrative or civil sanctions. *Id. at* 99. It is well-settled that "[p]rison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply." *Wolf v. McDonnell*, 418 U.S. 539, 556 (1974) (citation omitted).

In *New Mexico v. Astorga*, 13 P.3d 468 (N.M. Ct. App. 2000), the New Mexico Court of Appeals considered the application of the double jeopardy clause to prison disciplinary proceedings. There, the incarcerated defendant alleged that his criminal prosecution for conspiracy and assault of a fellow prisoner violated his right to be free from double jeopardy because he had already been subject to disciplinary action by the prison for the same incident. *Id.* at 469. The New Mexico Court of Appeals disagreed, holding that the forfeiture of the defendant's good time credits did not prevent his subsequent criminal prosecution on double jeopardy grounds. *Id.* at 470. The court reasoned that "[s]anctions such as administrative segregation and the loss of good time credit have the remedial purpose of 'removing harm from society' and 'social betterment and not individual punishment,' that speak more to the administrative challenge of effective prison management and less to the goal of individual punishment." *Id.* (quotation omitted) Moreover, the court explained that "the harm to society from criminal violations, even within a prison system, may not be adequately addressed by the

15

expedited and remedial prison disciplinary process." *Id.* The court acknowledged that the State may need to initiate separate criminal proceedings to address punishment in some cases, even when the prison has imposed disciplinary sanctions for the same conduct. *Id.* The court also observed that the Tenth Circuit has "long held that criminal judicial proceedings following administrative punishments imposed by prison officials do not violate the double jeopardy clause." *Id.* at (citing *United States v. Rising*, 867 F.2d 1255, 1259 (10th Cir. 1989)).

Relying primarily upon its rationale in *Astroga*, the New Mexico Court of Appeals rejected Petitioner's double jeopardy claim on direct appeal. *Doc. 10-1*, Ex. AA, at 193-95. The court concluded that the State was justified in seeking punishment for Petitioner's violation of § 38-3-3 in an independent criminal proceeding, despite the jail's imposition of remedial sanctions for the same conduct. *Id.* (citing *Astorga*, 13 P.3d at 470).

In his federal habeas petition, Petitioner now attempts to draw a distinction between double jeopardy as it applies to pretrial detainees and to prisoners who have been convicted. *Doc. 1* at 5. He argues that "prisons are post convictions and jails are pre-trial detainees, so prison double jeopardy issues are different, [as pretrial detainees] are presumed innocent until proven guilty, where as people in prisons are convicted." *Doc. 1* at 5. But Petitioner fails to provide any authority suggesting that his status as a pretrial detainee alters the applicable double jeopardy analysis here.

Respondents refer the Court to *Bell v. Wolfish*, 441 U.S. 520 (1979), a conditions-of-confinement class-action case in which pretrial detainees claimed that the restrictions at a detention center violated their constitutional rights. *See Doc. 10* at 10-

11. Although *Bell* is not entirely on point, it does lend support to the notion that Petitioner's criminal prosecution under § 38-3-3, following the imposition of disciplinary sanctions against him as a pretrial detainee, does not implicate double jeopardy concerns. In *Bell*, the Court acknowledged that pretrial detainees may not be "punished" in advance of a lawful adjudication of guilt. *Bell*, 441 U.S. at 539. It also discussed what amounts to "punishment," concluding that a restriction placed on pretrial detainees does not qualify as punishment if it is "reasonably related to a legitimate government objective . . . ." *Id.* On the other hand, "if a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary or purposeless – a court permissibly may infer that the purpose of the governmental action is punishment . . . ." *Id.* (citation omitted). Here, the imposition of disciplinary segregation and the restrictions of privileges by jail authorities against Petitioner served the legitimate government objective of promoting safety in a jail setting.

The Court is also satisfied that when the State prosecuted Petitioner for a violation of § 38-3-3, it was justified in seeking punishment through a criminal proceeding despite the disciplinary sanctions Petitioner had already endured for his possession of the sharpened eyeglass piece. Further, the law is clear that criminal prosecutions following the imposition of disciplinary sanctions, even for the same conduct, do not implicate double jeopardy concerns. As such, Petitioner has failed to demonstrate that the New Mexico Court of Appeal's resolution of his double jeopardy claim was contrary to or involved an unreasonable application of clearly established federal law. The Court recommends denial of Petitioner's double jeopardy claim.

**D.  Ineffective Assistance of Counsel Claims (Grounds Two and Six)**

In Ground Two, Petitioner argues that his trial counsel, Ms. Kerr, was ineffective because she failed to pursue his preferred theory of the case.[8] *Doc. 1* at 7. Specifically, he maintains that Ms. Kerr should have argued that the sharpened eyeglass piece was not a weapon but merely "a tool to take off handcuffs and shakles [sic] in case inmates popped cell doors to get to [him]." *Id.* Although Petitioner admits to possessing the sharpened eyeglass piece, he submits that he "acted under duress and had video that showed inmates attacking" him. *Id.*

In Ground Six, Petitioner expands on his ineffective assistance claim, arguing that Ms. Kerr denied him the ability to call two witnesses, Lionel Clah and Chris Privette, who would have purportedly testified as to the intended purpose of the eyeglass piece in his possession. *See id.* at 7, 17; *Doc. 10-1*, Ex. EE, at 223. According to Petitioner, if Ms. Kerr had elicited testimony from these witnesses, a jury would have been convinced that the eyeglass piece was used to "protect [him] from being killed while restrained." *Doc. 1* at 17. Petitioner described the anticipated testimony of Mr. Clah and Mr. Privette in his state habeas petition. *Doc. 10-1*, Ex. EE, at 223. He explained that Mr. Clah would have testified that he used a device similar to the eyeglass piece to unlock his own hand restraints. *Id.* Petitioner describes Mr. Privette as "his next door neighbor" in jail, who

---

[8] Petitioner also asserts that Ms. Kerr was ineffective when she "refused to recuse herself or resolve conflict of interest." *Doc.* 1 at 7. As best the Court can surmise, the "conflict" to which Petitioner refers centers around Ms. Kerr's refusal to adopt his preferred trial strategy and her perceived anger at him for "recusing" Mr. Clark. *See id.* But a conflict of interest exists when an attorney has an interest adverse to her client in the outcome of a case or when there is a complete breakdown in attorney-client communication. *See Hale v. Gibson*, 227 F.3d 1298, 1313 (10th Cir. 2000). The record here does not support the existence of either type of conflict. Rather, it suggests that Ms. Kerr vigorously pursued the interests of her client, despite his disagreement with her strategy in doing so.

18

"would always hold on to [the] tool" and "slide the tool over" to him for his use. *Id.*
According to Petitioner, Mr. Privette would slide the eyeglass piece over to him,
Petitioner would use it to unlock his own restraints, and "if any inmate was to illegally
pop their door open to attack [him, he] only had to pull on the shakles [sic] and cuffs and
they would come off and [he] could easily use the cuffs and shakles [sic] as a weapon to
defend [himself]." *Id.* In support of his theory of the case, Petitioner sought to
demonstrate for the jury his technique of unlocking his restraints in order "to prove to the
jury that [he] acted under 'duress' and would have requested such an instruction for the
jury." *Id.* at 222.

To establish ineffective assistance of counsel, a litigant must satisfy a two-part
test. First, he must show that counsel's performance was deficient because it fell below
an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 687-
88 (1984). Second, he must show that counsel's deficient performance prejudiced him.
*Id.* at 687. The litigant must satisfy both prongs outlined in *Strickland*; however, a court
may address each component in any order and need not address both if the litigant
makes an insufficient showing on one. *United States v. Dowell*, 388 F. App'x. 781, 783
(10th Cir. 2010).

In demonstrating that counsel's performance was deficient under the first prong
of the *Strickland* test, "[j]udicial scrutiny of counsel's performance must be highly
deferential" and the "court must indulge a strong presumption that counsel's conduct
falls within the wide range of reasonable professional assistance . . . ." *Strickland*, 466
U.S. at 689 (citation omitted). The reasonableness of counsel's performance must be
evaluated considering all the circumstances. *Id.* at 688. In addition, to establish

19

prejudice under the second prong of the *Strickland* test, a petitioner must show "that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "Surmounting *Strickland's* high bar is never easy." *Harrington v. Richter*, 562 U.S. 86, 88 (2011) (quotation omitted). When a *Strickland* challenge is coupled with the "highly deferential" standards of § 2254, the litigant's burden of proving unreasonableness becomes even more difficult. *Id.* The question becomes not whether counsel's actions were reasonable, but "whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.* at 105.

The New Mexico Court of Appeals weighed in on Petitioner's ineffective assistance claims on direct appeal, after Petitioner's appellate counsel, Mr. O'Connell, asserted that Petitioner sought to proceed *pro se* at trial in order to "present a factual defense that the alleged deadly weapon in this case was in fact a tool for opening restraints, rather than a 'shank' or jailhouse knife." *Doc. 10-1*, Ex. Z, at 169, 181. Mr. O'Connell argued that the "trial court permitted ineffective assistance of counsel, and denied [Petitioner] his defense, when it permitted Attorney Kerr to completely ignore the defense – which the trial court was aware that [Petitioner] wanted presented at trial." *Id.* at 179. Mr. O'Connell observed that "Ms. Kerr at no point raised the issue that [the eyeglass piece] was in fact not a weapon at all." *Id.* at 170. Instead, Ms. Kerr pursued a strategy of attacking the eyeglass piece's chain of custody and the element of possession. *See, e.g.*, *Doc. 10-1*, Ex. U, at 118 (arguing in her opening statement that the State cannot prove, through forensic evidence or otherwise, that Petitioner intentionally possessed the eyeglass piece found in his cell); *see also id.* at 127-29.

The Court of Appeals rejected Petitioner's ineffective assistance arguments, determining that he had failed to demonstrate ineffective assistance of counsel because the defense he urged Ms. Kerr to pursue (i.e. showing that the shank was not a weapon but a "tool for opening handcuffs and restraints") was unlikely to succeed. *Doc. 10-1*, Ex. AA, at 196-97. In the Court of Appeals' view, "the shank described in evidence presented at trial falls squarely within the statutory definition of a deadly weapon, regardless of [Petitioner's] asserted purpose for the honed eyeglass piece." *Id.* at 196 (citing N.M. Stat. Ann., § 30-1-12(B) (1978)). The court concluded that Ms. Kerr's refusal to pursue Petitioner's preferred theory was a "trial strategy that [it] would not second guess." *Id.* at 197.

Petitioner advanced ineffective assistance arguments in his state habeas petition similar to those advanced here. He argued that Ms. Kerr lied when she "claim[ed] that the item was a shank instead of the tool that it was." *Doc. 10-1*, Ex. EE, at 221. The state district court reasoned, however, that Petitioner's "argument that the sharpened glass temple piece would only be used to 'pop off' handcuffs would *support* his conviction." *Id.* at 285 (emphasis added). After the state district court denied his habeas petition, he petitioned for certiorari with the New Mexico Supreme Court. *See Doc. 10-1*, Ex. KK, at 364.  But the Supreme Court denied certiorari without discussion. *See id.*

Turning to the ineffective assistance of counsel claims asserted here in Petitioner's federal habeas petition, the Court begins its analysis with the understanding that a trial attorney is afforded wide latitude concerning trial strategy and that a § 2254 petitioner must overcome a presumption of sound trial strategy. *See Strickland*, 466 U.S. at 689. Moreover, "[t]he decision of which witnesses to call is quintessentially a

matter of strategy for the trial attorney." *United States v. Barrett*, 797 F.3d 1207, 1214 (10th Cir. 2015) (quoting *Boyle v. McKune,* 544 F.3d 1132, 1139 (10th Cir. 2008)).

Having considered Petitioner's claims and reviewed the record in the underlying criminal case, the Court is satisfied that there is at least a reasonable argument that Ms. Kerr satisfied *Strickland's* deferential standard when she followed a trial strategy other than the one promoted by Petitioner. Indeed, Ms. Kerr's strategy of casting doubt on Petitioner's intent to possess the sharpened eyeglass piece was a reasonable defense strategy under the circumstances of his case.

Petitioner's preferred theory, in contrast, could be described as inconsistent at best. In order to establish duress, as Petitioner sought to do, he would have necessarily conceded the elements of N.M. Stat. Ann. § 30-22-16, as the commission of the underlying offense is an element of the duress defense. *Compare* UJI 14-5130 NMRA, *with* N.M. Stat. Ann. § 30-22-16 (1978). Thus, had Ms. Kerr pursued the duress defense that Petitioner promoted, he would have found himself effectively conceding the very point that he repeatedly denied – that the eyeglass piece was a deadly weapon. *See* N.M. Stat. Ann. § 30-22-16. The inconsistency in Petitioner's position would have likely rendered his theory of the case unsuccessful. Because Petitioner cannot demonstrate that but for Ms. Kerr's refusal to follow his trial strategy the outcome in the underlying criminal case would have been different, he cannot demonstrate prejudice.

Even apart from Petitioner's problematic duress defense, his attempt to argue that the eyeglass piece was a tool rather than a weapon was also unlikely to prove successful. Indeed the New Mexico Court of Appeals concluded on direct appeal that the "shank described in evidence at trial" was "squarely within the statutory definition of

a deadly weapon, regardless of [Petitioner's] asserted purpose for the honed eyeglass piece." *See Doc. 10-1*, Ex. AA, at 197. This assessment of Petitioner's position was a reasonable one. This Court agrees that the sharpened eyeglass piece described in the record could reasonably be characterized as a "weapon which is capable of producing death or great bodily harm" and an object "with which dangerous cuts can be given, or with which dangerous thrusts can be inflicted." *See* N.M. Stat. Ann. § 30-1-12(B) (1978) (defining "deadly weapon").

Further, Petitioner's desire to demonstrate for the jury his technique for removing restraints with the eyeglass piece would have likely backfired. Critically, Petitioner explained that he removed his restraints so that he could use them as a weapon against fellow prisoners who threatened him. *Doc. 10-1*, Ex. EE, at 223. Given this explanation, such a demonstration would have supported *conviction* rather than acquittal.

Likewise, Ms. Kerr's refusal to call Mr. Clah and Mr. Privette to testify on Petitioner's behalf can be characterized as a reasonable trial strategy. The anticipated testimony of these men, as described by Petitioner, would not have furthered the trial strategy Ms. Kerr pursued. Indeed, testimony from Mr. Privette that he slid the eyeglass piece into Petitioner's cell for Petitioner's use in removing his restraints would have entirely undermined any attempt by Ms. Kerr to cast doubt on the element of possession.

In sum, Petitioner has failed to satisfy his § 2254(d) burden, as he cannot demonstrate that the state courts' decisions under *Strickland* were contrary to or involved an unreasonable application of clearly established federal law, or that they were based on an unreasonable determination of the facts in light of the evidence

presented. The Court, therefore, recommends denial of Petitioner's ineffective assistance claims.

### E. Right to Self-Representation and Presence at Trial Claims (Grounds Three and Four)

In Grounds Three and Four, respectively, Petitioner asserts that he was denied his right to self-representation and that he was unconstitutionally ejected from his own trial. *Doc. 1* at 8, 10. The record confirms that on multiple occasions Petitioner expressed a desire to proceed *pro se*, but it also reveals that he complicated the trial court's inquiry into his capacity and desire for self-representation and presence at trial through equivocation and lack of cooperation. Some discussion of the chronology leading up to Ms. Kerr's representation of Petitioner at trial without his presence provides helpful context to the Court's analysis of his claims.

Early on in his state criminal case, Petitioner filed a *pro se* motion to remove his court-appointed attorney, Thomas M. Clark. *See Doc. 10-1*, Ex. O, at 64. But when the trial judge inquired a few months later whether Petitioner still wished to proceed *pro se*, Petitioner withdrew his motion and assured the court that he was comfortable proceeding with Mr. Clark as his attorney. *Doc. 10-1*, Ex. C, at 5. After a few more months passed, Petitioner then renewed his *pro se* motion for Mr. Clark's removal, reporting that he wanted "any lawyer" but Mr. Clark. *See Doc. 10-1*, Ex. D, at 11-12. At a hearing on this renewed motion, the trial judge characterized Petitioner's contention that Mr. Clark was incompetent to represent him as "far fetched." *Doc. 10-1*, Ex. E, at 24.

Nevertheless, given Petitioner's renewed request to proceed *pro se*, the trial judge made inquiries into his educational background and experience in legal

proceedings. *Id.* at 15-16. Noting that his homicide charges exposed him to imprisonment in excess of a life sentence, the trial judge asked Petitioner whether he was comfortable proceeding *pro se* in a case of such severity. *Id.* at 16. Petitioner responded that he was not comfortable proceeding *pro se* but that he felt he was left with no choice if the court would not appoint a different attorney. *Id.* at 17. After advising Petitioner that he did not have a right to choose a different court-appointed attorney, the trial judge asked him directly whether he preferred to proceed with Mr. Clark as his lawyer or to proceed *pro se. Id.* at 19-21. Petitioner confirmed that he preferred the latter. *Id.* at 21.

The trial judge attempted to dissuade Petitioner from proceeding *pro se*, cautioning that it may be unwise for him to do so in light of the severe penalties he faced and the difficulty he would likely experience in navigating the legal process. *Id.* at 17-20. Nevertheless, Petitioner reiterated multiple times that his choice was to proceed *pro se* in each of the criminal cases against him. *Id.* The judge outlined the expectations on Petitioner as a *pro se* litigant, including the requirement that he follow both the rules of evidence and the rules of criminal procedure. *Id.* at 18. Petitioner then informed the court that he took a medication, Effexor, which might affect his ability to make decisions. *Id.* at 21. As a result, the court stayed the criminal proceedings, vacated Petitioner's trial date, and ordered a competency evaluation. *Id.* at 21-23. Mr. Clark remained as counsel for Petitioner during the stay of proceedings for his competency evaluation. *Id.* at 23.

Upon determining that Petitioner was competent to proceed to trial, the trial judge again asked Petitioner whether he wished to proceed *pro se. Doc. 10-1*, Ex. I, at 33. Petitioner responded that although he did not want to represent himself, he did not want

to be represented by Mr. Clark. *Id.* For his part, Mr. Clark advised the court that it was his impression Petitioner was attempting to create an ineffective assistance claim. *Id.* at 36. After Mr. Clark detailed the steps he had taken to investigate and prepare Petitioner's case, the trial judge concluded that there was no indication that Mr. Clark had not adequately represented Petitioner. *Id.* at 37. As such, she refused to remove Mr. Clark at that time. *Id.* at 33. Petitioner then became uncooperative.[9] *Id.* at 41. The trial judge gave him an opportunity to cool off and then, when he refused to respond to the court's inquiries, concluded the hearing. *Id.*; *see also Doc. 10-1*, Ex. O, at 64-65.

At a later hearing, the court heard Petitioner's "Motion for Pro-Se Status," in which he requested dismissal of his case on the ground that the trial judge had purportedly denied him the constitutional right to self-representation. *Doc. 10-1*, Ex. M, at 52; Ex. N, at 54. Petitioner reiterated that if his choice was between representation by Mr. Clark and proceeding *pro se*, he wished to proceed *pro se. Doc. 10-1*, Ex. N, at 57. Again, Petitioner asserted that the court's unwillingness to appoint a different attorney was effectively forcing him to proceed *pro se. Id.*

While the court was in recess, an argument ensued between Petitioner and Mr. Clark, which the court's bailiff and the state's counsel observed. *Id.* at 60. After hearing their respective accounts of what took place, the trial judge found that Petitioner yelled expletives at Mr. Clark and threatened to punch him and that Mr. Clark responded with expletives and prepared to defend himself if attacked. *Doc. 10-1*, Ex. O, at 65. The trial judge removed Mr. Clark as counsel, determining that the orderly administration of justice would be impeded if he were required to remain even as standby counsel for

---

[9] According to the August 2, 2017 Order Removing Tom Clark as Defendant's Attorney, Petitioner began "shouting" in court. *Doc. 10-1*, Ex. O, at 64.

26

Petitioner. *Id*. at 66. The judge also determined that Petitioner was competent to proceed *pro se* but set a follow-up hearing for two weeks out, allowing time for the public defender's office to determine whether they would appoint substitute counsel. *Id*. at 61, 66.

On August 10, 2017, at the request of the New Mexico Public Defender, Ms. Kerr entered her appearance as stand-by counsel for Petitioner. *See Doc. 10-1*, Ex. P, at 67. Shortly thereafter, Petitioner advised the court that he wanted Ms. Kerr to actively represent him, rather than remain merely on standby. *See Doc. 10-1*, Ex. Q, at 70. Ms. Kerr indicated that she was willing to represent Petitioner so long as he understood that she would not operate as co-counsel but as his sole attorney. *Id*.

Just before trial, however, Ms. Kerr advised the court that Petitioner had been rude to her and to her staff and that she informed him that she would not tolerate this manner of conduct. *Doc. 10-1*, Ex. U, at 100. Ms. Kerr also reported that Petitioner had expressed that he no longer wished for her to represent him at trial. *Id*. Petitioner confirmed to the court that he wished to proceed *pro se*. *Id*. Although the trial judge acknowledged that she had previously found Petitioner capable of representing himself, she warned Petitioner again that it was not advisable for him to do so. *Id.*

Petitioner told the court that he wanted Ms. Kerr to stay away from him during the trial. *Id.* at 101. When the court attempted to elicit assurances from Petitioner that he was making an informed decision to proceed *pro se*, Petitioner became unresponsive. *See id.* at 101-02. Ms. Kerr indicated that she was willing to sit in the audience while Petitioner represented himself or to represent him without his presence. *Id. at* 102. When the trial judge asked Petitioner whether he preferred to represent himself or to

have Ms. Kerr represent him without his presence, Petitioner responded that he wanted

to be excused. *Id.* at 103. The trial judge asked a follow-up question in an attempt to

confirm that Petitioner wanted Ms. Kerr to represent him without his presence; however,

Petitioner responded, "Do what ever you got to do." *Id.* Ultimately, Ms. Kerr tried the

case with Petitioner listening through headphones from an area described as a

"detention center in the courtroom." *Id.*

Under the Sixth Amendment every criminal defendant enjoys the right to waive

counsel in favor of self-representation. *Faretta v. California*, 42 U.S. 806, 807 (1975).

But to invoke this right, "a defendant must clearly and unequivocally assert his intention

to represent himself, and [he] must do so in a timely manner." *United States v.

Callwood*, 66 F.3d 1110, 1113 (10th Cir. 1996) (*United States v. Nunez*, 877 F.2d 1475,

1478 (10th Cir.), *cert denied*, 498 U.S. 981 (1989)). The Sixth Amendment also

guarantees a criminal defendant the right to be present in the courtroom at all critical

stages of his prosecution. *Illinois v. Allen*, 397 U.S. 337, 338, 342 (1970). This right,

however, is not absolute. Indeed, the United States Supreme Court has acknowledged

that a defendant can give up the right to be present, either by consent or by misconduct.

*See id.* at 342-43.

The New Mexico Court of Appeals considered Petitioner's claims that he was

denied the right to self-representation and to be present at trial and concluded as

follows:

> the [trial] judge undertook every precaution possible to ensure that
> [Petitioner's] desires to proceed pro se were recognized, that his rights
> were protected, and that both his written and oral continuous, yet
> inconsistent, intentions to proceed pro se were thoroughly considered and
> discussed exhaustively at every turn. After [Petitioner's] repeated requests
> to proceed pro se, followed by acquiescing to representation by appointed

> counsel, the judge gave [him] the option of either representing himself, with trial counsel present in the audience, or to having appointed counsel represent him, without his presence in the courtroom, and [Petitioner] chose the latter. Given [Petitioner's] clear and repeated indecisiveness, we cannot say it was error for the trial judge to limit [Petitioner's] choices in order to move the trial forward without further disruption.

*Doc. 10-1*, Ex. AA, at 197-98 (citing *State v. Ahasteen*, 968 P.2d 328, 334 (N.M. Ct. App. 1998), *abrogated on other grounds by New Mexico v. Savedra*, 236 P.3d 20 (N.M. 2010)).

The appellate court accurately represented Petitioner's inconsistent expressions of his desire to proceed *pro se*, and the undersigned agrees that the trial court's conclusion was sound. Taken as a whole, Petitioner's assertions of his intent to represent himself were equivocal at best. Moreover, when the court attempted to elicit assurances from Petitioner that he was making an informed decision to proceed *pro se* at the time of his trial, Petitioner was unresponsive. *See Doc. 10-1*, Ex. U at 101-02. This was hardly the clear and unequivocal assertion of the intent to proceed *pro se* that the law requires.

Petitioner's repeated lack of cooperation with the court and with his court-appointed attorneys also led the trial judge to reasonably limit Petitioner's choices concerning his representation at trial. After being presented with the choice of proceeding *pro se* with standby counsel or allowing Ms. Kerr to represent him without his presence, it was Petitioner, not the trial judge, who made the choice to be excused from the courtroom while Ms. Kerr represented him at trial. Petitioner effectively gave up his right to be present during trial. Under these circumstances, Petitioner cannot overcome the presumption of correctness that is due to the New Mexico Court of

Appeals' determination under 28 U.S.C. § 2254(e). The Petition should be denied as to Grounds Three and Four.

### F. Due Process Claim (Ground Five)

In Ground Five, Petitioner argues that the State denied him due process by failing to preserve surveillance videos, which he purports depicted "at least seven different inmates and guards attacking and beating" him. *Doc. 1* at 10. Petitioner insists that the videotapes would have been exculpatory in that they would have "proved [his] duress defense." *Id.* Although Ms. Kerr apparently reported giving Petitioner the requested videos, Petitioner asserts that the disc she provided him did not in fact contain the surveillance footage he was requesting. *Id.*

While Respondents maintain that Petitioner failed to exhaust this due process claim, as he did not argue in his state habeas petition that the State failed to preserve surveillance videotapes, they nevertheless urge the Court to decide Petitioner's claim on the merits. *See Doc. 10* at 20 (citing 28 U.S.C. § 2254(f)(3)). Because this claim is easy to resolve, especially given the Court's prior analysis of Petitioner's potential duress defense, the Court should excuse Petitioner's failure to exhaust this claim.

Criminal convictions obtained by suppression of exculpatory evidence violate the due process guarantees of the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Giglio v. United States*, 405 U.S. 150, 153-54 (1972). In *Brady v. Maryland*, 373 U.S. 83 (1963) the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Exculpatory evidence is only material,

however, if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is one "sufficient to undermine confidence in the outcome." *Id.* The mere "possibility" that undisclosed material would have helped the defense is insufficient to establish materiality. *United States v. Agurs*, 427 U.S. 97, 109-10 (1976). As the Supreme Court put it in *Kyles v. Whitley*, 514 U.S. 419 (1995), "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* at 434.

Petitioner sought the surveillance videos to support his duress defense. *See Doc. 1* at 10. As explained above, however, the duress defense upon which Petitioner sought to rely was inherently inconsistent with his theory of the case. Again, Petitioner has refused to concede that by possessing the sharpened eyeglass piece, he possessed a deadly weapon in violation of N.M. Stat. Ann. § 30-22-16. Instead, he maintains that the eyeglass piece was merely a tool. Given this position, Petitioner could not satisfy the elements of a duress defense and, thus, introduction of the surveillance videos would not have changed the outcome of the proceeding in the manner he describes. Without a reasonable probability that the videos would have changed the outcome of Petitioner's criminal trial, any failure by the State to disclose them cannot be said to have deprived Petitioner of his right to due process. Petitioner's claim under Ground Five should also be denied.

### G.  Speedy Trial Claim (Ground Eight)

Petitioner asserts that he was denied the constitutional right to a speedy trial. *Doc. 1* at 19-20. He, like all criminal defendants, was guaranteed a speedy trial by the Sixth Amendment to the U.S. Constitution, which is applicable to the states through the Fourteenth Amendment. *See* U.S. Const. amend. VI; *Klopfer v. North Carolina*, 386 U.S. 213, 222-24 (1967) (holding that the due process clause of the Fourteenth Amendment incorporates the speedy trial right to state prosecutions); *see also* N.M. Const. art. II, § 14. Because "the substance of the speedy trial right is defined only through an analysis of the peculiar facts and circumstances of each case[,]" *New Mexico v. Garza*, 212 P.3d 387, 393 (N.M. 2009), discussion of the pretrial chronology in Petitioner's underlying criminal case is warranted.

Petitioner was arraigned in his deadly-weapon case on February 15, 2016. *Doc. 10-1*, Ex. KK, at 365. His attorney, Mr. Clark, filed a motion to continue on March 7, 2016, which the court granted. *Id.* at 366. On April 11, 2016, Petitioner, still represented by Mr. Clark but acting in a *pro se* capacity, filed his first motion to remove Mr. Clark and requested appointment of different counsel. *Doc. 10-1*, Ex. B, at 3. Three months later, on July 11, 2016, the trial court held a hearing at which Petitioner reversed course, advising that he wished to withdraw the motion and proceed with Mr. Clark as his attorney. *Doc. 10-1*, Ex. C, at 5. The parties anticipated that trial would commence in Petitioner's deadly-weapon case in November 2016, with a combined pretrial conference for his three criminal cases to take place on October 24, 2016. *See id.* at 6-8.

At the pretrial conference on October 24, 2016, however, Petitioner renewed his request to dismiss Mr. Clark. *Doc. 10-1*, Ex. D, at 11. The trial court set the matter for a

hearing the following week, at which Petitioner confirmed his desire to proceed *pro se*. *Id.* at 13; *Doc. 10-1*, Ex. E, at 15. However, when Petitioner advised the court that it needed to determine whether he was mentally competent to proceed to trial, given medication he took that impacted his decision-making abilities, the court stayed his criminal proceedings so that he could undergo a competency evaluation. *Doc. 10-1*, Ex. E, at 21-22.

The parties reconvened on April 11, 2017, when Mr. Clark informed the court that Petitioner had been found to be competent. *Doc. 10-1*, Ex. I, at 33. When the conversation over Petitioner's self-representation re-commenced, Petitioner became nonresponsive and obstructive. *See id.* at 33, 37. Petitioner refused to respond to the court's inquiries, and the trial judge, therefore, concluded the hearing. *Id.* at 41; *see also Doc. 10-1*, Ex. O, at 64-65. Trial on the deadly-weapon case was then set for August 1, 2017. *Doc. 10-1*, Ex. J, at 42.

When the parties appeared for the first day of trial, the court was presented with two *pro se* motions from Petitioner – a Motion for Change of Venue and a Motion for Pro Se Status. *Doc. 10-1*, Ex. L, at 51; Ex. M, at 52. The trial court engaged in another round of questioning Petitioner as to his intentions and capacity to represent himself, and Petitioner advised the court that he was not yet ready to proceed to trial. *Doc. 10-1*, Ex. N, at 55. Petitioner suggested that the trial court was effectively forcing him to proceed *pro se* by refusing to appoint a different attorney to represent him. *Id.* at 56. As discussed above, while the trial judge was taking a short recess, Petitioner and Mr. Clark got into a verbal altercation, which resulted in the trial judge removing Mr. Clark as defense counsel and continuing trial. *Id.* at 60-61.

After Ms. Kerr entered her appearance in Petitioner's case, trial was reset for October 2017. *Doc. 10-1*, Ex. P, at 67; Ex. Q, at 70. The State indicated that it was not opposed to a continuance of the trial, with the understanding that speedy trial would be waived. *Doc. 10-1*, Ex. Q, at 70. Ms. Kerr confirmed that a continuance, for purposes of the right to a speedy trial, would weigh against the defense. *Id.* Before trial commenced, however, Petitioner again requested to proceed *pro se*, refusing to answer questions from the trial court about his self-representation. *Doc. 10-1*, Ex. U, at 100-01. Ultimately, at Petitioner's request, he was excused from the courtroom, and Ms. Kerr litigated the case on his behalf while he listened through headphones. *Id.* at 103-04.

To determine whether a pretrial delay violates a defendant's constitutional rights, courts use a four-part balancing test. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972). The applicable non-dispositive *Baker* factors include: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) the prejudice to the defendant. *Id.*

First, courts consider whether the interval between accusation and trial "crossed the threshold dividing ordinary from 'presumptively prejudicial' delay." *Doggett v. United States*, 505 U.S. 647, 651-52 (1992) (quotation omitted). In New Mexico, delay is typically deemed presumptively prejudicial at twelve months for simple cases, fifteen months for intermediate cases, and eighteen months for complex cases. *See Garza*, 12 P.3d at 391.

In Petitioner's case, there was a twenty-month delay between his arraignment and trial. *See Doc. 10-1*, Ex. KK, at 365-67. Respondents concede that "under any applicable measure, the delay is considered presumptively prejudicial." *Doc. 10* at 23

(citing *Garza*, 212 P.3d at 391). Accordingly, the first factor weighs in Petitioner's favor. There is, however, no corresponding presumption that Petitioner's speedy trial right was violated based solely on the threshold determination that the length of his pretrial delay was "presumptively prejudicial." *See Garza*, 212 P.3d at 391. As the New Mexico Supreme Court has explained, the guidelines for presumptively prejudicial delays "are merely thresholds that warrant further inquiry into a defendant's claimed speedy trial violation and should not be construed as bright-line tests dispositive of the claim itself." *Id.*

In consideration of the second factor, the reason for delay, the Court notes that delays attributable to a criminal defendant do not weigh against the State for speedy trial purposes. *See United States v. Hicks*, 779 F.3d 1163, 1168 (10th Cir. 2015). Here, a review of the record reveals that the relevant delays were attributable to Petitioner, save the possible exception of the five-month delay for Petitioner's competency evaluation.[10] Specifically, delays resulted primarily from Petitioner's lack of cooperation with the court and counsel (*see, e.g.*, *Doc. 10-1*, Ex. I, at 33, 37, 41; Ex. O, at 64-65; Ex. N, at 60-61) and from his vacillating between wanting to proceed *pro se* and wanting to be represented by counsel (*see, e.g.*, *Doc. 10-1*, Ex. B, at 3; Ex. C, at 5; Ex. D, at 11; Ex. E, at 15; Ex. M, at 52; Ex. U, at 100-03). Delays caused by Petitioner's behavior, including his unresponsiveness and hostility, undermine his constitutional claim. *See*

---

[10] The delay caused by Petitioner's competency evaluation should not weigh against Petitioner or the State. Such delays do not typically weigh against the government, "because the state cannot try an incompetent defendant." *See New Mexico v. Stock*, 147 P.3d 885, 890 (N.M. Ct. App. 2006) (citation omitted); *see also* 18 U.S.C. § 3161(h)(1)(A) ("delay resulting from any proceeding . . . to determine the mental competency . . . of the defendant" is excluded under the Speedy Trial Act.). Moreover, Petitioner acquiesced to the delay for his competency evaluation. *See Doc. 10-1*, Ex. E, at 21.

*Vermont v. Brillon*, 556 U.S. 91, 90-94 (2009). Because the State confirmed its readiness for trial as early as April 11, 2017 (*see Doc. 10-1*, Ex. I, at 36), and the Court cannot identify any delay attributable to the State, the second factor weighs *heavily* against granting the Petition on speedy trial grounds.

As for the third factor, assertion of the right to speedy trial, courts consider the "'frequency and force' of the defendant's objections to the delay." *Garza*, 212 P.3d at 398 (quoting *Barker*, 407 U.S. at 529). The record reveals that Ms. Kerr made a demand for speedy trial on Petitioner's behalf in connection with her entry of appearance on August 10, 2017. *See Doc. 10-1*, Ex. P, at 67. Additionally, on April 11, 2017, when the trial court was attempting to set Petitioner's criminal cases for trial, Petitioner inquired whether the proposed dates violated his speedy trial rights. *Doc. 10-1*, Ex. I, at 40. Petitioner insisted that he had never asked for a postponement. *Id.* But, when these infrequent and less-than-vigorous assertions of Petitioner's speedy trial right are placed in the context of a twenty-month pretrial period with numerous delays attributable to Petitioner, the Court finds that the third factor weighs only *slightly* in Petitioner's favor. *See New Mexico v. Thomas*, 376 P.3d 184, 191 (N.M. 2016) (reasoning that because the defendant did not make a "focused assertion" of his right to a speedy trial until almost two years had passed, the "history weigh[ed] only slightly in [the defendant's] favor") (citation omitted).

Finally, the Court must consider the prejudice of pretrial delay to Petitioner. "[G]enerally a defendant must show *particularized* prejudice of the kind against which the speedy trial right is intended to protect." *Garza*, 212 P.3d at 400 (emphasis added). While certain of the foregoing speedy trial factors weigh in Petitioner's favor, New

Mexico courts have clarified that "only where the length of delay and the reasons for the delay weigh heavily in [a] defendant's favor and [the] defendant has asserted his right and not acquiesced to the delay [does] the defendant need not show [particularized] prejudice in order to prevail on a speedy trial claim." *Thomas*, 376 P.3d at 190 (quoting *New Mexico v. Samora*, 307 P.3d 328, 336 (N.M. 2013)). But here, the reasons for delay weigh heavily *against* Petitioner. As such, the Court turns to the prejudice factor to round out its analysis of Petitioner's speedy trial claim.

Courts have enumerated three interests for analyzing prejudice of pretrial delays to a defendant: "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." *Garza*, 212 P.3d at 398 (quotation omitted). The Court notes that "[s]ome degree of oppression and anxiety" is inherent for any defendant who is in jail while awaiting trial. *Id.* (quotation omitted). But Petitioner has not articulated any specific prejudice resulting from his pretrial incarceration, nor has he identified any testimony or evidence that he could have offered in his defense absent the delay. The Court will not speculate on his behalf.

Moreover, as Respondents have noted, the delay in Petitioner's deadly-weapon case occurred while he was being held for capital murder and other serious offenses. *Doc. 10* at 25-26. As a result, Petitioner would have remained incarcerated apart for delays in his deadly-weapon case. Because Petitioner has not shown particularized prejudice cognizable under the constitution, this factor weighs heavily against granting his Petition on speedy trial grounds.

On balance, the *Barker* factors fail to support Petitioner's speedy trial claim. Indeed, where the pretrial delay was largely attributable to Petitioner, the weight of the first three factors cannot overcome Petitioner's failure to demonstrate particularized prejudice. *See Garza*, 212 P.3d at 391, 400. Therefore, the Court recommends denial of Petitioner's speedy trial claim.

## IV.    Recommendations

For the reasons set forth herein, the Court recommends that the Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (*Doc. 1*), filed by Rick G. Stallings on January 6, 2020, be denied and dismissed with prejudice. The Court recommends that a certificate of appealability be likewise denied.

_____
UNITED STATES MAGISTRATE JUDGE

---

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1). A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**

---